# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-60071

United States Court of Appeals
Fifth Circuit

**FILED**

September 16, 2020

Lyle W. Cayce
Clerk

Consolidated with No. 19-60152

STP NUCLEAR OPERATING COMPANY,

      Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent Cross-Petitioner

---

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board
NLRB Nos.  16-CA-222349
and 16-CA-223678

---

Before HIGGINBOTHAM, JONES, and DUNCAN, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In two separate proceedings, which we consolidated for review, the National Labor Relations Board ("NLRB" or "the Board") certified two groups of employees of STP Nuclear Operating Co. ("STP") to join a collective bargaining unit represented by the International Brotherhood of Electrical Workers, Local Union 66 ("the Union").  STP refused to recognize and bargain with the Union on the basis that its "unit supervisors" and "maintenance

Nos. 19-60071
Cons. w/ No. 19-60152

supervisors" are excluded from the bargaining unit pursuant to the National Labor Relations Act. *See* 29 U.S.C. § 152(11). STP petitions to reverse the NLRB's bargaining order, and the Board cross-petitions for enforcement. Because the Board's conclusions that these employees are not statutory supervisors are premised on errors of law and lack substantial evidence, we **REVERSE** the bargaining order and **DENY** enforcement.

## BACKGROUND

STP operates two pressurized water nuclear reactors in Wadsworth, Texas that generate electricity sent to the Texas power grid. The power generated provides electricity to approximately two million residential customers. Nearly five hundred employees, who occupy numerous technical positions in operation, maintenance and production, are represented by the Union.

Petitions were filed to include in the bargaining unit two additional classes of employees. The first group consists of unit supervisors, who oversee the operations crews for each reactor.[1] Working in 12-hour shifts, the operations crews ensure that the reactors are continuously running except during planned outages. The second group comprises three dozen plant maintenance supervisors, each of whom manages a crew of eight or more employees in six different maintenance specialties.

**Unit Supervisors**

Operations crews are organized according to a strict hierarchy. Ten Shift Managers, who are stipulated statutory supervisors, oversee ten respective crews. The ten crews are divided between the two reactors (Alpha, Bravo,

---

[1] The petition for this group also included senior reactor operator instructors, but STP conceded the eligibility of those employees for union representation.

Nos. 19-60071
Cons. w/ No. 19-60152

Charlie, Delta, and Echo) and work different scheduled shifts. Each crew consists of two or three unit supervisors overseeing two or three reactor operators, and six or seven plant operators. Whether unit supervisors may be included within the plant's union was the subject of one NLRB proceeding.

At the start of each shift, unit supervisors review the Authorized Work Schedule (AWS)[2] for work to be performed and assess whether plant conditions are satisfactory for the scheduled work. They also verify that their crew members have the necessary certifications to perform the tasks.

One unit supervisor works from an elevated platform in each reactor control room, a fifty-by-sixty foot room featuring thousands of switches and monitors. From there he oversees the activities of the reactor operators who adjust reactivity within the reactor and test safety-related equipment. Reactor operators work at two stations on the control room floor—the primary station (responsible for the nuclear reactor) and the secondary station (controlling the turbine generator and other auxiliary equipment). The reactor operators' duties entail monitoring instruments, adjusting the components, and responding to alarms as necessary.

The other unit supervisor(s) directs the plant operators spread throughout the plant as the reactor operators' "eyes and ears." These unit supervisors are in constant communication with the control room as operators for whom they are responsible monitor and manipulate the plant equipment.

Legally, unit supervisors are required to hold a Senior Reactor Operator license issued by the federal Nuclear Regulatory Commission (NRC). Reactor operators, in contrast, hold only Reactor Operator licenses, while plant

---

[2] The AWS is a pre-planned facility-wide schedule, which outlines the work to be completed on any given day

operators are unlicensed. The distinction between the two licenses, as explained by federal regulation, is that senior reactor operators are licensed both "to manipulate the controls of a facility *and to direct* the licensed activities of licensed operators." 10 C.F.R. § 55.4 (emphasis added). Training for the senior license takes 18 months, and STP requires a minimum of three years' experience as a reactor operator for its senior reactor operators. The Decision and Direction of Election factually errs when it states that "Unit supervisors must have the same kind of license as a reactor operator and must complete one extra week of training than a reactor operator." This confuses the statutorily prescribed licensure schemes and conflates the significantly greater training and experience of a senior reactor operator with a one-week leadership program STP provides.

As might be expected for a nuclear reactor plant, the work of the operations crews is highly regulated and overseen by the government. Accordingly, STP has developed manuals and written guidance that govern the vast majority of scenarios that unit supervisors may face when handling their responsibilities. STP also invests heavily in training, employs a human performance coach, and has implemented a rigorous process of documentation and review when crews commit errors.

**Maintenance Supervisors**

The status of maintenance supervisors as potential union members was the subject of a second NLRB proceeding. Like the operations department, the maintenance division is also hierarchically structured. There are six specialized maintenance groups under Division Manager Rudy Stastny's control: mechanical maintenance, electrical maintenance, facilities maintenance, integrated maintenance, instrument and control, and the metrology and radiology laboratory. Each maintenance group's manager

4

Nos. 19-60071
Cons. w/ No. 19-60152

reports to Stastny.  The parties stipulate that the group managers are statutory supervisors.  Under the managers are maintenance supervisors.

Thirty-six maintenance supervisors are divided among the maintenance groups.[3]  Each maintenance supervisor is in charge of a crew of typically eight or more employees.  The crews are responsible for repairing, testing, and fabricating equipment and components necessary to operate the reactors.  Unlike the maintenance supervisors, members of the crew perform hands-on work in the field or shops.  The maintenance supervisors have their own offices, certify employees' work hours, and routinely receive and approve leave requests in the first instance.

**Procedural History**

In February 2018, the Union filed a petition for an *Armour-Globe* election to determine whether unit supervisors should be added to the existing bargaining unit of nearly 500 company employees including the reactor operators and plant operators.  In May, the Union separately petitioned for an *Armour-Globe* election as it sought to add the maintenance supervisors to the bargaining unit.  STP opposed both petitions on the basis that unit supervisors and maintenance supervisors are statutory supervisors excluded from the Union by the NLRA.

After holding hearings on each petition, the Regional Director for Region 16 issued Decisions and Directions of Election finding that the

---

[3] The breakdown of maintenance supervisors is:
- 8 Mechanical Maintenance Supervisors;
- 7 Electrical Maintenance Supervisors;
- 10 Integrated Maintenance Team ("IMT") Supervisors;
- 6 Instrument and Control ("I&C") Supervisors;
- 4 Facilities Maintenance Supervisors; and
- 1 Metrology Supervisor in the Metrology and Radiology Lab.

Nos. 19-60071
Cons. w/ No. 19-60152

Company failed to establish that either group of employees should be classified as supervisors. STP timely requested Board review of each decision,[4] but the Board declined. The Board's denial of a request for review constitutes an affirmance of the Regional Director's decision. *Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 138 n.2 (1971). Both groups of employees voted to join the union.

After the elections were certified, STP refused the Union's requests for recognition and bargaining. Region 16 initiated unfair labor practice complaints based on STP's refusal to bargain with the Union. The General Counsel for Region 16 moved for summary judgment in both proceedings. The Board granted the motions without a hearing and upheld that STP violated 29 U.S.C. § 158(a)(5) and (1). The Board's Orders direct STP to recognize and bargain with the Union as the representative of unit supervisors and maintenance supervisors in the bargaining unit.

STP now petitions this court for review of the NLRB decisions, and the Board cross-petitions for enforcement. Facing an identical legal issue in each case, we consolidated the appeals.

## STANDARDS OF REVIEW

"Whether an employee is a supervisor is a question of fact." *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001). As the party asserting supervisory status, STP has the burden of proof. *Entergy Mississippi, Inc. v. N.L.R.B., (Entergy II)*, 810 F.3d 287, 295 (5th Cir. 2015); *see also NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711–12 (2001).

---

[4] STP did not contend that the unit supervisors do not share a "community of interest" with employees in the existing bargaining unit and has thus waived that issue. 29 C.F.R. § 102.66(d).

Nos. 19-60071
Cons. w/ No. 19-60152

Under 29 U.S.C. § 160(e), the NLRB's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (quoting *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)). "We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, even if the evidence preponderates against the [Board's] decision." *Creative Vision Res., L.L.C. v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018) (internal quotation marks and citation omitted). We "defer to plausible inferences the Board draws from the evidence, even if we might reach a contrary result were we deciding the case de novo." *Alcoa Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (cleaned up). The determinative rulings here are the Decisions and Direction of Election issued by the Regional Director, which the Board adopted without variance. *In-N-Out Burger. Inc. v. NLRB,* 894 F.3d 707, 714 (5th Cir. 2018).

Nevertheless, "[o]ur deference . . . has limits." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013); *see also Creative Vision Res.*, 882 F.3d at 515 ("[O]ur review is [not] *pro forma* (i.e., it is not merely a 'rubber stamp')."). We must "consider the whole record," and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464–65 (1951). Such consideration of the record "as a whole" is required by 29 U.S.C. § 160(e)–(f). "[A] decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard." *Carey Salt Co.*, 736 F.3d at 410 (quoting *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983)). Accordingly, "we must consider the facts that militate or detract

7

from the NLRB's decision as well as those that support it." *Alcoa, Inc.*, 849 F.3d at 255; *see also Entergy II,* 810 F.3d at 296–98 (holding that the Board lacked substantial evidence because it refused to grapple with countervailing portions of the record). These principles were recently reiterated, and a NLRB factual decision was overturned by this court as lacking substantial evidence. *See DISH Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020). The following analysis proceeds at some length to lay out the record showing why we conclude the Board's factual findings were not supported by substantial evidence.

## DISCUSSION

The NLRA enables employees to unionize unless excluded by Section 2(3), which covers "any individual employed as a supervisor," 29 U.S.C. § 152(3). As a result, "the statutory definition of supervisor [is] essential in determining which employees are covered by the Act." *NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 573 (1994). Section 2(11) of the NLRA defines a supervisor as:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

The Supreme Court holds that employees are statutory supervisors only if "(1) they have the authority to engage in a listed supervisory function, (2) their exercise of such authority is not merely of a routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held

8

in the interest of the employer."[5]  *Kentucky River*, 532 U.S. at 713 (internal quotation marks and citation omitted); *accord In re Oakwood Healthcare, Inc.*, 348 NLRB 686, 687 (2006).  It is also settled that supervisory status inheres disjunctively in the statutory list, such that a person who exercises any one of the listed duties is a supervisor.  *See, e.g., NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1276 (5th Cir. 1986).  Moreover, the possession of authority to engage in any of these functions—even if this authority has not yet been exercised—is what determines whether an individual is a supervisor.  *In re Wal-Mart Stores, Inc.*, 340 NLRB 220, 223 (2003).

As the Court's test demonstrates, not only must a supervisor have authority to perform one or more of the twelve listed functions, but she must exercise that authority with independent judgment.  *Oakwood*, 348 NLRB at 692–93.  Consistent with *Kentucky River*, the NLRB held in *Oakwood* that "a judgment is not independent if it is dictated or controlled by detailed instructions;" nevertheless, "the mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices."  *Id.* at 693; *see also Kentucky River*, 532 U.S. at 712–718.  For example, a supervisor who determines which employee should do a particular job exercises independent judgment if that determination involves "a personal judgment based on personal experience, training, and ability."  *Oakwood*, 348 NLRB at 693.  But making the only obvious choice or assigning work solely to equalize workloads is "routine or clerical in nature and does not implicate independent judgment."  *Id*.  Yet again, even the discretion to

---

[5] Neither party argues nor did the Board hold that unit supervisors do not act in the interest of the employer.  Therefore, the test's third element is satisfied.

determine whether certain situations exist that would trigger pre-established procedures can "involve the exercise of independent judgment." *Id.*

STP asserts that both groups of putative supervisors possess indicia of supervisory status.[6] Unit supervisors, it contends, are allowed to assign work; responsibly direct work; and discipline or reward their directly assigned employees. Maintenance supervisors, according to STP, perform numerous listed functions: they assign tasks, times and location; responsibly direct work; hire or recommend hiring; reward or discipline directly managed employees; and adjust grievances. Because STP was required to prove only that each group exercise one of the statutory criteria necessary to qualify as a "supervisor," the following analysis bears on the critical factor for each group. As a result, we conclude that the Board lacked substantial evidence to find that unit supervisors do not "responsibly direct" work and maintenance supervisors do not "assign" work.

## A. Unit Supervisors

The Board's holding that unit supervisors do not "responsibly direct work" suffers from notable errors and deficiencies in reading the record.[7]

---

[6] In fact, it is undisputed that both groups possess superficial indicia of supervisory status: unit supervisors are considered "supervisory" by those under their charge and have considerable additional qualifications; maintenance supervisors have individual offices, spend only a portion of their time out and about the plant, and wear different attire; both groups are paid somewhat more than those they oversee. In this circuit, the existence of secondary indicia of supervisor status can reinforce the company's argument. *See Poly-Am., Inc. v. N.L.R.B.*, 260 F.3d 465, 479 (5th Cir. 2001) ("[S]upervisory status may also be found on the basis of various 'secondary indicia' of such authority."). Nevertheless, we find it unnecessary to weigh these secondary indicia because the unit supervisors and maintenance supervisors each clearly exercise at least one of the statutorily enumerated functions.
.

[7] The Board's conclusion conflicts with *Maine Yankee Atomic, Etc. v. NLRB,* 624 F.2d 347 (1st Cir. 1980), which held that a nuclear plant's "shift operating supervisors," a group functionally identical to STP's unit supervisors, were statutory supervisors. Because applicable law has evolved in ensuing decades, this holding cannot be determinative. But we

Despite the deferential standard afforded the Board's decisions, "we are free to disregard the agency's findings when it ignores relevant evidence without explaining and justifying its decision to do so." *NLRB v. E-Sys., Inc., Garland Div.*, 103 F.3d 435, 439 (5th Cir. 1997) (holding the ALJ's decision was not supported by substantial evidence because the record contained unaddressed, contradictory evidence despite the ALJ's characterization of certain claims as "uncontradicted"). Further, we must review the Board's decision "on the record considered as a whole," 29 U.S.C. § 160(e)–(f), and the Board's failure "to grapple with countervailing portions of the record" can support a conclusion that the Board's decision is unsupported by substantial evidence. *Dish Network*, 953 F.3d at 377.

A supervisor who "responsibly directs" others must have "the authority to direct the subordinate's work and take corrective action when necessary, and the supervisor could be held liable for the subordinate's performance of his job." *Entergy II*, 810 F.3d at 295, *citing Oakwood*, 348 NLRB at 692. Thus, STP must show that (1) "the employer delegated to the putative supervisor the authority to direct the work," (2) the employer also delegated "the authority to take corrective action, if necessary," and (3) "there is a prospect of adverse consequences for the putative supervisor if he/she does not take these steps." *Oakwood*, 348 NLRB at 692. "Direction" encompasses both monitoring employee performance to make certain that tasks are performed correctly and making discrete assignments of specific tasks. *In Re Beverly Enterprises-Minnesota, Inc., (Golden Crest Healthcare Center)*, 348 NLRB 727, 730 (2006).

---

must agree with our sister circuit's conclusion, following a lengthy analysis of the shift operating supervisors' ("SOS") comparable duties, that "[t]he responsibilities of the SOS are too important, his duties too complex, and his authority over [other control room personnel] too clearcut to admit of another result." *Id.* at 366.

Making discrete assignments includes deciding what job will be performed next or who shall do it, provided that such direction is both responsible and carried out with independent judgment. *Oakwood*, 348 NLRB at 694.

The Board held that unit supervisors meet none of the three elements. Our independent review of the whole record reveals that substantial evidence, largely ignored by the Board, contradicts this conclusion.

To begin, the Board inexplicably denigrated the role of unit supervisors by misstating their qualifications and failing to note the special role accorded them by federal regulations. As noted earlier, unit supervisors oversee reactor and plant operators because they must possess a Senior Reactor Operator license, which requires 18 months training, and STP requires them to take additional training and have at least three years' experience at the reactor operator level. Not only did the Decision and Direction of Election err in describing unit supervisors' qualifications, but it neglected to consider that by virtue of their superior license, unit supervisors are equipped both "to manipulate the controls of a facility *and to direct* the licensed activities of licensed operators." 10 C.F.R. § 55.4. As federal regulations explain,

> The staffing rule requires the continuous presence of a senior operator in the control room to ensure the following:
>
> a. An individual is available who can provide the oversight function of the supervisor and improve the probability of correctly detecting abnormal events early enough to mitigate potential adverse consequences.
>
> b. The senior operator in the control room is aware of plant conditions before, and resulting from, an abnormal event. This helps ensure that the extra experience, training, and knowledge of the senior operator is available to aid in promptly mitigating the event.
>
> c. The operator at the controls can concentrate on performing the immediate actions necessary to mitigate the event

Nos. 19-60071
Cons. w/ No. 19-60152

rather than having to brief the senior operator about the event if the senior operator was absent from the control room when the event occurred."[8] Ultimately, all this means that STP's unit supervisors have the authority to shut down the reactor in the event of an emergency based on their trained, independent judgment. It is peculiar that a senior reactor operator, despite possessing considerable additional qualifications and exercising the serious oversight responsibility accorded by one federal agency, should be deemed by another federal agency not to be a statutory supervisor of the reactor operators and plant operators whose activity he must oversee.

Numerous employees, moreover, testified that unit supervisors use their own judgment, experience, and training to determine the order of tasks, delegate those tasks to employees, and respond to situations that arise in the facility. Bill Jefferson, the Operations Director over the unit supervisors, testified that "[t]he Unit Supervisor is the point person that provides approval of work that occurs in the power plant . . . . [T]he Unit Supervisor makes that decision as to whether [operators] can perform their job or not based on plant conditions and based on other activities that are going on at the time." Unit supervisor Mark Hamilton,[9] when asked if he relied on preestablished procedures to make decisions, explained, "[O]bviously we do have procedures . . . my training is also involved. My experience, my own knowledge, all that goes into my decision-making process." Hamilton also

---

[8] U.S. Nuclear Regulatory Comm'n., Office of Nuclear Regulatory Research, Regulatory Guide 1.114 Rev. 3, "Guidance to Operators at the Controls and to Senior Operators in the Control Room of a Nuclear Power Plant" at 3 (October 2008).

[9] At the time of his testimony, Hamilton was a Shift Manager Up Release, but his testimony concerned his experiences as a unit supervisor.

spoke of assessing the "capabilities" and "stress levels" of the reactor operators under him when assigning work. Another unit supervisor, Jeremy Tillman, testified that his personal judgment played a role in evaluating plant conditions. Additionally, Hamilton and Tillman explained that unit supervisors delegate specific tasks from the AWS to particular employees and reassign, reorder, or delay work as necessary. Apparently in an effort to discount this evidence, which it otherwise ignored, the Board remarked only that "the role of the unit supervisor is procedure driven." There are procedures and then there are procedures. Paraphrasing *Oakwood,* the unit supervisor's assignment of tasks in safely operating and maintaining the controls of the nuclear reactor manifests his "authority to direct the work;" the existence of procedures for myriad devices, monitors and functions in the nuclear control room does not eradicate the discretionary choices the record shows unit supervisors must make. Substantial evidence does not support the Board's contrary conclusion.[10]

Next, the Board acknowledged that when an employee makes a mistake—called a "human performance event"—the unit supervisor must remove that employee from the task, but nevertheless found that unit supervisors do not exercise independent judgment when taking corrective action.[11] Substantial evidence does not support this conclusion. The Board completely ignored other corrective actions that unit supervisors take, such as

---

[10] As indicated in the discussion of the maintenance supervisors, matching employees' skills to discrete tasks indicates the exercise of independent judgment; and the testimony of the Operations Director shows that unit supervisors independently determine what work is accomplished. *See Oakwood,* 348 NLRB at 689.

[11] The Decision and Direction of Election appears to confuse the meaning of "corrective action" with the ability to discipline employees.

counseling employees on their mistakes, giving employees an "oral reminder" if the mistakes are pervasive, identifying and writing up the "lessons learned" for distribution to other crew members, and taking corrective action at the plant to rectify the mistake. While procedures may outline a menu of corrective actions open to unit supervisors, the unit supervisors decide which option or options to pursue.

In the context of highly regulated industries, such as medical services or nuclear power generation, written protocols are nearly ubiquitous. But "the mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." *Oakwood*, 348 NLRB at 693; *see also NLRB v. Quinnipiac College*, 256 F.3d 68, 78 (2d Cir. 2001) (collecting cases holding that the mere existence of written policy does not preclude finding that supervisors exercise independent judgment). Instead, we inquire whether unit supervisors' actions are "merely routine or clerical." *Id*. They are not. In *Oakwood* the Board explained that even "the discretion to determine when an emergency exists . . . would involve the exercise of independent judgment." *Id*. at 693–94. Unit supervisors have that discretion and more. From the testimony discussed above, unit supervisors must assign tasks from the AWS, prioritize work, judge whether an error has been made, decide how to correct the error, determine what lessons should be drawn from the mistake, decide whether to discipline the offending employee, judge whether an emergency exists, and even evaluate whether an emergency is severe enough to justify shutting down the reactor. These judgments are not only governed by complex procedures, but they involve significant discretion

Nos. 19-60071
Cons. w/ No. 19-60152

on the part of the unit supervisors.[12]  As the unit supervisors testified, they make these determinations "based on personal experience, training, and ability." *Id.* at 693.

Finally, the Board's conclusion that unit supervisors are not held accountable for the actions of their subordinates is not supported by substantial evidence.  When determining whether putative supervisors are accountable, we look for specific evidence of actual or possible adverse consequences the supervisors may face.  *In re I.H.S. Acquisition No. 114, Inc. d/b/a Lynwood Manor*, 350 N.L.R.B. 489, 490–91 (2007) (employer had not shown that LPN nurses were held accountable for the actions of their subordinates).  STP offers an Incentive Compensation Program (ICP) that provides a bonus to unit supervisors based on their performance and the performance of their crew.  The Operations Director testified that "[i]f [a unit supervisor] had enough events or an event that is significant enough that you get a written warning, then your ICP is impacted."  In fact, a unit supervisor can lose some or all of a bonus because of a written reminder, and Jefferson discussed a chart indicating that the bonuses of some unit supervisors had been adjusted down because they were "involved in errors or events."  Jefferson explained that the amount of the bonus is affected by "[the unit supervisors'] individual performance and the performance of their subordinates."  STP also points to record evidence establishing that unit supervisors are required to correct their subordinates.  Unit supervisors can "veto" decisions of reactor operators, they must write "human performance condition reports," and they

---

[12] Commenting on an incident, Operations Director Jefferson testified that the unit supervisor conducted "a prompt investigation," "created Lessons Learned," "removed the qualifications of the indivdual [who made the mistake]," and "took independent action and restored a system back to service."

16

must detect "abnormal events early enough to mitigate potential adverse consequences." Thus, unlike the nurses in *I.H.S. Acquisition*, unit supervisors are responsible for the actions of their subordinates and can suffer repercussions for their own performance or the performance of their crews.

The Decision and Direction of Election omitted all of this evidence. Instead, the Board made two assertions: "there is no evidence regarding what percentage the incentive compensation plan has on overall wages," and there is insufficient evidence "whether unit employees are also impacted by crew performance." These statements are flatly contradicted by the record. The Operations Director testified that unit supervisors could receive up to 15% of their salary as a bonus from the ICP. He further explained that the amount of the unit supervisor's bonus was a function of both "their individual performance and the performance of their subordinates."

After considering the record as a whole, we are convinced that the Board's decision that unit supervisors do not responsibly direct work is unsupported by substantial evidence. Because the unit supervisors are statutory supervisors, STP did not violate the NLRA by refusing to bargain.

## B. Maintenance Supervisors

The Regional Director's decision, affirmed by the Board, found that STP did not meet its burden to prove that maintenance supervisors "assign" work using "independent judgment." The administrative decision construed the term "assign" by reference to the Board's *Oakwood* decision. There, the Board interpreted "assign" to mean "the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee." *Entergy II*, 810 F.3d at 296 (citing *Oakwood*, 348 NLRB at 689). Generally, "the decision or effective recommendation to

affect place, time or overall tasks—can be a supervisory function." *In re Oakwood*, 348 NLRB at 689. The Board also described its holding more particularly:

> [t]he assignment of an employee to a certain department (e.g., housewares) or to a certain shift (e.g., night) or to certain significant overall tasks (e.g., restocking shelves) would generally qualify as 'assign' within our construction. However, choosing the order in which the employee will perform discrete tasks within those assignments (e.g., restocking toasters before coffee makers) would not be indicative of exercising authority to 'assign.'

*Id.* As applied to regular (not occasional) charge nurses in a hospital, the Board affirmed their position as supervisory if the nurses "assign" certain nurses under their direction to work with certain patients during a shift.

*Oakwood* interpreted the "independent judgment" aspect of supervisory status to mean that "a judgment is not independent if it is dictated or controlled by detailed instructions," but "the mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." *Id.* at 693. The Board explained its interpretation with examples drawn from the status of charge nurses at a hospital. One of the examples was this: "if the registered nurse weighs the individualized condition and needs of a patient against the skills or special training of available nursing personnel, the nurse's assignment involves the exercise of independent judgment." *Id.*

In support of its finding that maintenance supervisors do not "assign" employees to places, times, or overall tasks, the Board explained that maintenance supervisors generally assign employees based on the work set out in STP's Authorized Work Schedule (AWS). The AWS comprehensively describes, in detail and hour-by-hour, the work to be performed by every crew on every shift. A host of planners prepares the AWS through an ongoing 14-

18

week planning process, and the Regional Director found that maintenance supervisors play "no role in creating" the AWS. Because maintenance supervisors generally assign work from the AWS, the Board concluded that maintenance supervisors fulfill a purely ministerial role in implementing already-established assignments. The Board also argues that the assignments handed out by maintenance supervisors are merely discrete tasks, not the more general designations of time/place/overall jobs that characterize statutory "assignments." *See Mars Home for Youth v. NLRB*, 666 F.3d 850, 855 (3d Cir. 2011). The Board asserted that because maintenance supervisors "follow pre-planned procedures," their occasional delegation of tasks to specific employees based on experience or certifications is not an exercise of "independent judgment."

The Board's findings, however, are not supported by substantial evidence because it ignored significant portions of the record showing that maintenance supervisors indeed assign work using independent judgment. In *Lord & Taylor v. NLRB*, we held that an ALJ decision that ignored management testimony as well as all testimony from the petitioner that was damaging to her case is not supported by substantial evidence. 703 F.2d 163, 169 (5th Cir. 1983). Similarly, in *Entergy II*, "we held the Board lacked substantial evidence merely because it failed to grapple with countervailing portions of the record," thereby fulfilling our own obligation to "review the Board's decisions 'on the record considered as a whole.'" *Dish Network*, 953 F.3d at 377 (discussing *Entergy II*, 810 F.3d at 292 (quoting 29 U.S.C. § 160(e)–(f)).

So here, the Board failed to discuss or at best perfunctorily mentioned at least four discrete tasks that maintenance supervisors perform, which illustrate their authority to "assign" work. First, contrary to the Board's

19

finding, the record reveals that maintenance supervisors have significant input in the creation of the AWS. The company's work management scheduling rules are the basis for the 14-week AWS. Six weeks before work is to be performed, the list of needed activities is distributed to maintenance supervisors, who "coordinate the resolution of walkdown exceptions and update the walkdown status in the 'WMS'." What this means in practice was elaborated on by witnesses as a significant role in the formation of the final schedule. Jim Bob Presswood, an electrical maintenance supervisor, testified that he "would make final adjustments" and sometimes get "job[s] reassigned to a different crew." Presswood is currently the shop scheduler—a position that rotates among the electrical maintenance supervisors—whose function is to help create the AWS from inception to implementation.[13] Brent Taylor, a mechanical maintenance supervisor, testified that he could "assign work that is not on the AWS" and did so "weekly." Taylor also reviews the AWS during its creation. John Griffon, the metrology supervisor, explained that he does not work off of the AWS and that he autonomously sets the schedule for the employees he supervises. David Thorton, a team manager who oversees the maintenance supervisors, testified that the maintenance supervisors are involved in the creation of the AWS, "own their schedule," get to "approve" things "put on their schedule[s]," and that they are authorized to remove tasks from the schedule. Turning a blind eye to this compelling testimony, the Board

---

[13] The Board's factual findings regarding Presswood are especially erroneous in that the Board misstates his role as shop scheduler, omits that Presswood assigns employees to tasks partially based upon an assessment of their individual skill, and ignores Presswood's participation in the creation of the AWS.

Nos. 19-60071
Cons. w/ No. 19-60152

concluded that maintenance supervisors have "no role in creating" the AWS.[14] We cannot agree that substantial evidence supports this finding.

Second, maintenance supervisors regularly reassign employees to other crews on a temporary basis without managerial oversight. Presswood testified that he would sometimes "borrow somebody from another crew or get the job reassigned to a different crew." Taylor stated that he would sometimes swap an employee "from the Machine Shop into . . . Mechanical Maintenance Diesels." Paul Horning, a maintenance supervisor, testified that he "frequently . . . borrow[s] crew members" without getting approval from a superior. Roger Wilkinson, an electrical maintenance supervisor, explained that he would "on occasion . . . borrow or swap . . . employees." Team Manager Thorton stated that maintenance supervisors do not need his authorization to make a swap. Many of these exchanges involve significant changes in duties and responsibilities for the traded employee. Such assignments designate employees to a "department," delegate "significant overall duties," and have "a material effect on the employees' terms and conditions of employment." *Oakwood*, 348 NLRB at 698, 695. Clearly this authority goes well beyond the mere "ad hoc instruction" and perfunctory prioritization that the Board acknowledged the maintenance supervisors possessed. Yet in the face of this testimony, and without even mentioning it, the Board found that "[m]aintenance supervisors do not designate or deploy employees to specific areas." Substantial evidence does not support this conclusion.

---

[14] The Board also argues that some maintenance supervisors simply assign work from the AWS. While the record provides support for this point, the relevant inquiry is whether the maintenance supervisors have the authority to influence the creation of the AWS or assign work not included in the AWS. *See Wal-Mart Stores*, 340 NLRB at 223. Evidence that some supervisors do not exercise their authority does not discredit STP's argument that the supervisors have that authority, as proven by those choosing to wield it.

Nos. 19-60071
Cons. w/ No. 19-60152

Third, maintenance supervisors delegate tasks to their crews based on their assessment of individual crew members' skills and certifications. Virtually every maintenance supervisor testified to this fact. Assessing employees' skills is not a statutory element of independent judgment, but such evaluation commonly supports a finding that assignments are made using independent judgment. *See, e.g., Oakwood*, 348 NLRB at 689 (holding that "matching a patient's needs to the skills and special training of a particular nurse is *among those factors* critical to the employer's ability to successfully deliver health care services"); *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1265 (11th Cir. 1999) (finding no assignment authority because employer failed to show docking pilots made assignments based on the skills and experiences of the putative subordinates) (*citing NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1279 (5th Cir. 1986)). While the Board acknowledged that "maintenance supervisors may sometimes delegate work based on the experience level or certifications of the employee," it denied that maintenance supervisors use "independent judgment" and asserted that such assignments follow "pre-planned procedures."

Other than the fact that certain certifications are required for certain jobs,[15] no evidence in the record supports the Board's claim that maintenance supervisors merely follow pre-planned procedures when delegating tasks. To the contrary, Wilkinson, a Union witness, explained, "I have to know the individuals—if I have more than one individual with the same [certification], I have to know who has the experience to be most successful at the job. I make

---

[15] Even when such certifications are required, the AWS does not assign particular employees to particular tasks, leaving the delegation of assignments to maintenance supervisors.

22

that determination." Horning testified that he tries to pair workers with complementary skillsets together when making his assignments. Thorton testified that maintenance supervisors "run their crews" and use their judgment to assign work based on employees' experience levels without supervision. Additionally, as previously discussed, the record establishes that the practice of borrowing employees from other crews is frequently done on the basis of the exchanged individual's certifications and skills. In short, maintenance supervisors exercise independent judgment when delegating tasks.

Fourth, maintenance supervisors can assign limited amounts of overtime. The Decision and Direction of Election erroneously asserts that there is "no evidence supervisors may require an employee to work overtime." Thorton, however, testified that maintenance supervisors could keep employees beyond their normal hours without his permission.[16] Griffon explained that he decides whether his employees work overtime. Presswood stated that he would authorize overtime without a superior's approval unless "it is going into the weekend." Moreover, most supervisors testified that they could authorize vacation and sick leave. *See Monotech of Mississippi v. NLRB*, 876 F.2d 514, 517 (5th Cir. 1989) (finding a supervisor excluded from the bargaining unit based on only two supervisory factors, one of which is authority to grant partial days off). As *Oakwood* held, "appointing an employee to a time (such as a shift or *overtime period*)" qualifies as assignment. *Oakwood*, 348 NLRB at 689 (emphasis added).

---

[16] Thorton did state that his permission would be necessary for maintenance supervisors to require overtime on a weekend.

23

Nos. 19-60071
Cons. w/ No. 19-60152

Because the Board's decision incorporated serious factual errors and ignored substantial parts of the record, its findings are not supported by substantial evidence in the record. *See Dish Network*, 953 F.3d at 377 (the Board lacked substantial evidence because "it failed to grapple with countervailing portions of the record"). The Board's decision is also inconsistent with *Oakwood* and with its most recent decision in *Entergy Mississippi*. Of course, every supervisory status case must be tested according to its facts, and lessons may only be cautiously drawn from other case law. Nevertheless, an analogy with *Oakwood* seems apparent. Charge nurses at a hospital, the Board understood, take orders from multiple management representatives and medical professionals. In the tasks they perform, described as assigning particular shift nurses to particular patients according to their knowledge of the nurses' experience and skills, the Board concluded charge nurses acted as statutory supervisors. To perform STP's business of operating and maintaining two nuclear reactors, situated on a multi-acre complex of buildings, requires massive and highly specialized coordination among various departments, each of whose decisions translates down to the maintenance crews who do the work ordered by their respective managers. Maintenance supervisors daily weigh the infinite variety of the work, the constant intervention of additional tasks, and the need for particular certifications and mixes of skilled craftsmen to keep the reactors going. In sum, the maintenance supervisors' crews are very much like "nurses" under their charge and the plant's facilities and equipment "patients" under their care. From a statutory standpoint, they are readily comparable to the charge nurses in *Oakwood*.

Similarly, the most recent *Entergy Mississippi* decision recognized that the *Oakwood* standard had been met, and power plant dispatchers are

24

Nos. 19-60071
Cons. w/ No. 19-60152

supervisors, because they assign specific crews to address power outages at specific places and prioritize the handling of multiple outages, all using independent judgment. *Entergy Mississippi, Inc.*, 367 NLRB No. 109, *4–5 (Mar. 21, 2019). Although the goal of STP is to avoid crisis situations that would require such on-the-spot decisionmaking, the record here demonstrates that maintenance supervisors' duties and responsibilities are far more complex than making automaton-like assignments from a fully predictable, dictated work schedule. Maintenance supervisors are not ordering the employees under their direction to "restock toasters before coffee makers." *Oakwood*, 348 NLRB at 689.

We therefore reverse, for lack of substantial evidence, the Board's conclusion that maintenance supervisors do not "assign" work using "independent judgment." As supervisors, they were not within the bargaining unit. STP did not violate the NLRA by refusing to bargain.

## CONCLUSION

For these reasons, STP's unit supervisors and maintenance supervisors are statutory supervisors under 29 U.S.C. § 152(11). Accordingly, STP did not violate the NLRA by refusing to bargain with the Union. We **REVERSE** the NLRB's bargaining order and **DENY** enforcement.